Lucent Technologies, Case No. 06-1053. Mr. Desmarais, am I pronouncing your name correctly? Mr. Desmarais. Mr. Desmarais. Not even close. Pardon me. Mr. Desmarais. A few extra letters in there. Please proceed. Thank you, Your Honor, and I've reserved five minutes for rebuttal. May it please the Court, in granting summary judgment of non-infringement in this case, the District Court erred in at least three respects. One, it clearly weighed the evidence and chose Dolby's evidence over Lucent's evidence, not believing Lucent's evidence and not drawing reasonable inferences to Lucent's benefit as it was supposed to do. And by Lucent's evidence, just, I'm sorry, by Lucent's evidence, you mean Lucent's reliance on certain excerpts of testimony by Dolby's experts? Right, Dolby's designers and engineers, and based on pretrial documents that Dolby created and wrote, and therefore our admissions against Dolby. The second way the District Court erred was by accepting a conclusory expert report by Dr. Brandenburg as substantive evidence, and this Court's law clearly prohibits that. And third, it not only accepted Dr. Brandenburg's conclusory report, but it used it as a guidepost to render summary judgment using that report and where it conflicted with Lucent's evidence than disregarding Lucent's evidence. And acting in this way, the District Court clearly violated the law and erred, and it ought to be reversed. With respect specifically to the 457 patent, there's no dispute between the parties that Dolby's exponent strategy is assigned based on the signal. The D45 strategy is assigned to transient or signals that vary in time or are unstable, and the D15 strategy is assigned to signals that are stable or that vary little over time. The District Court found that, and there's no dispute. That's at A10 through 11 of the Court's opinion. The dispute for that patent centers on whether that variability or stability can be tied to tonality. On that issue is where the District Court ruled against us, and we presented sufficient evidence on that issue. For instance, Dolby's engineer Grant Davidson testified that a tone is a signal of constant frequency, stable. That's at A142.47. He also testified that noise-like signals have a flat spectrum. That's at A142.54. Then if you look at the Dolby AC-3 documents, they say quite clearly that the D45 strategy goes to flat spectrum, which Grant Davidson testified is noise. The problem I had with your description is you take little snippets from a deposition, which may or may not support your point, and then link them all together with attorney argument in an exceptionally difficult technology. They're not self-evident, and I'm wondering why you think that even though these little snippets might seem in part to support your theory, why that's enough to go to a jury without an expert report. Well, here we're talking about a couple different things. First of all, I would agree with you in some respects that technology can be complicated in this area, but the question we're deciding is not complicated. The only issue the district court found we failed on in the 457 patent is whether the stability or transience of a signal is associated with tonality. The witnesses admitted it was. We don't have to get into the technology. Dolby said in its description of the technology in the AC-3 technical documents that stability is tonal and unstability is noise-like. It's an admission in the documents. If I'm talking about the same thing, the district court response, it seems, unless I'm talking about something else, that there's no evidence that Dolby actually uses a spectral flatness measure. And in reference to your evidence about the section of a document setting the standard for AC technology, the district court said it's never been implemented.  So that's the missing link. That's exactly where the district court went wrong. That's what the district court concluded. Here's what the district court ignored. The district court gave the—there's a document that was written by six Dolby engineers, the audio engineers who made this product. It was presented to the Audio Engineering Society, and it describes this technology. At deposition— Describing this technology as the technology that has been implemented by Dolby? Right. So let me tell you what the evidence is. That's exactly where I'm going. I just wanted to make sure you understood what document I was talking about. Now, the district court gave that document the back of its hand because, in the district court's view, Todd testified it was more a marketing document than an accurate technical piece. That's what the part of Todd's testimony the district court relied on. And then the district court disregarded that document entirely. What the district court didn't do was look at the balance of Todd's testimony, where Todd testified the technical description in that document was accurate. That's at A143.10. But maybe I'm missing something. Let me interrupt. What I'm missing is it seems to me, and maybe I'm not reading this correctly, what the district court concluded was that this reference standard, that even he refers to Todd's testimony, and he says he also testified that Dolby did not actually implement what is described in them. Are we talking about the same thing? Right. Let me be clear. There's two different documents. The court was wrong on both. You're talking about the standard. Let me go there first. The 852A standard. Yeah, let me go there first. I was talking about the presentation to the engineer. On the standard, the court yet again got it wrong because the court concluded there, as you said, that technology was not implemented. In order to reach that conclusion, the court- No, he didn't conclude it was. I mean, the question is whether or not you fought for sufficient evidence to establish it was implemented. I don't know whether it was implemented. Well, I'm going to tell you what our evidence was on that particular point. First of all, if you look at the balance of Lewis Felder's testimony, he testified. The relevant section of that standard is 8.2.8, which talks about how the exponent strategy is done in the products. Felder testified at A14145 and at A14146 about specific sentences and whether they were implemented in AC-3. And that was specifically said, is that sentence implemented, is that sentence implemented, et cetera. That's at A14145 and A14146. He testified that it was implemented. Then, if you look at the presentation to the Audio Engineering Society, it correlates- When you're pointing me to transcripts, can you give me a line? Yes, page 75, line 13, through page 76, line 7. Okay, so where is he saying- If you look at page 75, line 13, through page 76, line 7, we specifically asked him whether the technology was implemented. And he says it was. Let me turn to that page, too, so I can follow along. 75, line 13. Again, so he says, okay. We ask him if it's correct. He says yes. And then if you go to A14146, page 80, line 20. Are you there? Yes. Again, looking at page 103 of exhibit 130, that's the standard. I'm now looking at the second full paragraph. Okay. It says here, and then we quote it. Do you see that? Yes, I do. We're up on page 81 now, line 11. The question, and is that the way the exponent strategy is implemented in AC-3? I believe so. And then we go through a bunch of questions, continuing on page 82. And then if you jump up to the top of page 83, line 2. And that's true. That's implemented in AC-3. Implementations answered, as far as I know. So when you look at what the witnesses actually said, they said it was implemented in AC-3. And that's not it. Those sections of the AC-3 standard are the same as the technical description in the presentation to the Audio Engineering Society, which was written by Dolby engineers and presented by Dolby engineers. And we asked Todd at his deposition, are the descriptions in that document accurate? He said yes, they're accurate. And that maps perfectly with the standard. So what the district court judge did. But back to Todd now. The district court judge says, referring to Todd, but he also has testified that Dolby did not actually implement what is described in that. So how do you get around? Here's what happened when you look at the testimony. When the document referred to the word tonality, which is the claim language, the witnesses gave a conclusory denial. No, we don't do that because they've been sued for doing that. But then we asked them when we pressed them, do you do this? Do you do this? How is it implemented? They said yes every single time. So the judge is taking conclusory denials about the claim language and disregarding all the testimony about how the exponent strategy was, in fact, actually implemented. But you're equating transience with tonality. And while there appears to be some overlap, there's no expert or even engineering statement which says that transience is the same as tonality. Sometimes yes, sometimes no. So every time you give a snippet, if you keep reading down the deposition page, then they say, well, sometimes it is, but sometimes it's not. And so without you having an expert, how do you actually show tonality when Brandenburg says that the two known measures were not met in the source code? In the documents that Dolby created that describe their product, the presentation to the AES standards industry group and the standards body, they describe how the exponent strategy is set up. And they say very clearly that the D15 strategy is used for stable signals that are tonal and the D45 strategy is used for unstable signals that are flat. And their engineers testified unequivocally, and I have to cite to Grant Davidson, he said a tone is a signal with a constant frequency phase and noise refers to a flat spectrum. So why couldn't you get one expert in the United States of America to say this? We have an expert, and the expert reports have been filed. We didn't use them at the summary judgment stage, but to say that we don't have an expert is not a true state of affair. But why didn't you? Well, if you don't use an expert, then it's as good as not having him. As a summary judgment, right? Well, for summary judgment, we'll use him for the trial, obviously, but we're not going to use him at the summary judgment here. We have plans to use him for the trial. But at summary judgment, this court is held repeatedly at summary judgment. And so courts in the Ninth Circuit, at summary judgment, there's no difference between fact testimony and expert testimony. The question is, our evidence is to be believed if we have put in evidence, and you're not allowed to balance it against Dolby's. We have put in evidence that clearly shows Dolby admitted in their documents that the D-15 strategy is for stable tonal signals. They use the word tonal. And the D-45 strategy is for unstable flat signals, and they admit flatness is noise. If you believe that description of their technology, I have an issue of fact for a jury. That's what the legal standard is. The legal standard in the Ninth Circuit and in this court is not, do you folks evaluate the evidence and conclude what a reasonable juror will decide? The standard is, if I come forward with proof, and I have, it is to be believed and inferences that are reasonable are to be drawn in my favor without regard to what Dolby says, and I get beyond summary judgment. If I lose a trial, that's another question. Mr. Morris, I'm sorry. No, go ahead. All right. You're into your rebuttal. Do you want to reserve your time? Yeah, I'll reserve my time for that. All right. Thanks. Mr. Cooper. Good morning. May it please the Court. My name is John Cooper speaking on behalf of Dolby Laboratories. I'm here with my colleague, Andrew Leibniz. The problem here is that Lucent does not point to, does not address where the limitations in these two patents are located in the accused device. They don't cite to the Dolby AC-3 source code at all except a gang site at footnote 3, page 8 of their reply brief, where they just cite to about 4, where they recite to about 8 or 10 pages of code with no explanation. Absolutely no explanation. But what about the pages that the other side directed me to in the appendix and the testimony of Mr. Fielder? 14, 147, page, I'm referring to page 81 of the transcript, where the question is, is this the way the exponent strategy is implemented in AC-3? And he says, I believe so. He was making reference to, I believe, the test of 147, page 80. These are the sites that I'm just, the ones we talked about on the other. He was making reference to the ATSC, the Advanced Television Systems Committee standard, and to section 8 of that standard. And it's clear in the record that section 8 was informative and was not nominal. So it was not a section that was required to be implemented. It was informative. That's at the record 10560. The fact of the matter is that Dr. Brandenburg reviewed the code. He looked at the code. He looked at all of that testimony. And he is an expert in tonality. He's an undenied expert in tonality. He recognized that there are two measures of tonality. One is measure of spectral flatness. The other was his invention of polynomial predictor. And so I submit, Dolby submits that the court's ruling in Centricut is controlling here. This is exactly what happened in Centricut versus ESOP, which this court handed down in December of 2004. In that case, the court said, the central issue in this case is whether the absence of relevant expert testimony resulted in a failure of proof. It's just a little troubling to me. I mean, maybe I just misunderstood that you were responsive to my question. I mean, I was talking about Mr. Fieldler's testimony. The fact that Mr. Brandenburg, another expert, let's assume hypothetically another of Dolby's experts, ties it all together, explains away what other people have said, why isn't that at least enough to give the other side defeat summary judgment? I mean, the question to me is if there's some things in the record that are enough to create questions, issues of fact. So the fact that Mr. Brandenburg may have put a gloss or restated or stated a different way, something that another expert said, doesn't get rid of that, does it, for purposes of summary judgment? But I think that's the point of view of Centricut. Centricut stands for the proposition that you cannot just lay out a bunch of very complex evidence to a judge and then have the judge decide it. The fact was that the judge found that the portion of the testimony which they were referring was not, in fact, implemented by Dolby. And the citation that Mr. Damaris made to page 14146 of the record on page 77, the judge pointed out, and it is at page 77, lines 19 through 23, where he said, I want you to focus not on whether this is actually done and explicitly tested in AC-3, but whether the sentences are reasonable. And the court pointed out that they asked him not to address themselves to what was actually done, but to a hypothetical. The fact is that they have to point to where the limitations, and each and every limitation in an asserted claim is found in the accused. No, I understand that, and I appreciate that, and there's some discussion of that somewhere in the briefs, about how they weren't asking, they took this information and it was based on a question. But I guess, maybe I'm just misreading it. What do you make of the language on the question on page 81 of the transcript, that's on 14147, where the question is, is this the way the exponent strategy is implemented in AC-3? And he says, I believe so. Is that dealing with something else? The question is? That seems to be talking specifically about the AC-3 model. So maybe I'm just misunderstanding the context of that particular question. It says, if the exponent would be used for only a single block, then using the D-45 strategy. If the new exponents would be used for two or three blocks, then the D-25 strategy is used. If the new exponents are used for four, five, or six blocks, they use strategy D-15. That doesn't say anything about tonality, because the evidence is that the D-15 codes a tone exactly the same way that it codes a steady state noise. So if you have an onset of steady state noise, and then a steady state noise, it codes it exactly the same as if you have the onset of a tone, and then a steady tone. And so that language doesn't say anything at all about tonality. And that is the entire point, I believe, I respectfully submit, about Centrica. Because as Lucent says at page 14 of their reply brief, a list of documents cannot stand in the place of reasoned explanation. And in Centrica, the court said, in effect, you cannot, the district court cannot be left to conduct an analysis of the evidence and find infringement. In that case, the ESOP submitted to the judge a list of work function values and said, well, hafnium has a lower work function than copper, therefore conclude that there's been infringement. That's exactly what happened here. Lucent points to some testimony from engineers who know about coding, audio coding. They are not experts in tonality. The claim term is tonality. These are not 702 experts in tonality. They do know about coding, but they have testified each time that they didn't know about tonality or what the measures of tonality were. And yet, Lucent does exactly what this court found ESOP could not do in the Centrica case. And that is, and I'll describe a quote from page 1368 of that case, said ESOP asserts that the testimony regarding the general properties of hafnium and silver and their use within the plasma arc torch welding field was sufficient to prove that the work function was satisfied. But the court pointed out that those engineers who knew about arc welding, they were not experts in work function. And the court said, quoting again from page 1369, each of ESOP's three theories suffers from the same deficiency. None is supported by expert testimony. And so we have, that's exactly what Lucent has done here. They've brought up some engineers, Dolby engineers who know about coding and who know about transients. And now they have said, aha, we've put together some of this, and that means, therefore, that there is infringement on tonality. And we called Dr. Brandenburg, an undisputed world-renowned expert in tonality. He invented MP3 players. And he reviewed the code. His report is not conclusory. He reviewed the code, the AC-3 code, which is the accused device. He reviewed the testimony of the Dolby engineers. He reviewed the claims to construction. He reviewed the orders of the court. And he said, there are two ways to measure tonality. And he recited them, spectral flatness measure and polynomial predictor. And he said, I have reviewed this code, and I find neither of those measures of tonality in this code. They rebut that in no way. They rebut that and come back and say, well, the engineers said maybe this or that about flatness, where they said the same thing about, and they don't reach no conclusion about tonality. No expert to help this judge or to help this court in terms of what tonality is. That, the claim element in this claim is tonality. The claim element in Centrica was work function. I believe that the Centrica opinion is controllable in this case. Am I correct they had the source code for a while before the expert reports were due? Oh, they had the source code from as early as 1996. When they licensed this technology from Dolby. And then we produced it to them substantially, substantially before. And what was that skirmish at the end? Was that had to do only with the licensee source code? No, no. I know there was an expert issue. We produced the source code to Lucent in 1996, in March of 1996, and then again in July of 2000, or in January of 2003. And Lucent took Steve Vernon's deposition as a 30B6 witness on Dolby's source code. And the judge ruled that we answered the interrogatories correctly about the source code and the information that they asked for. And then Lucent refused to file an expert report. That's fully briefed in the time frame. They asked for, they wouldn't agree to a time when expert reports should be filed. And so the default position was January 10th, according to the federal rules, 90 days before trial. Lucent asked for a claims construction, or I mean a status conference, on January 7th. That was the Friday before the Monday, which was January 10th. And the evidence is very clear. They asked for a continuance of the time to file an expert report.  I, Judge Bogle, will not decide that. If you bring on an emergency motion before the magistrate judge, Judge Seaborg, if you bring on an emergency motion, and I'm now quoting from 7840 of the record, if he, Judge Seaborg, thinks that there is merit or potential merit to your motion, then he can, in his discretion, decide to extend the deadline at least until the motion is decided. But I'm not going to make that decision for him. He, Judge Bogle, said I'm not going to make that decision. He made reference to the TRO, and he said bring on that motion on an expedited basis before Judge Seaborg. And if Judge Seaborg, not Judge Bogle, decides to extend it, that will be the situation. They did not bring on an expedited motion. They filed a motion on 35 days' notice. We were now less than 90 days away from trial. They filed a motion on 35 days' notice. Judge Bogle, in his properly, said I'm entitled to manage my courtroom. I'm entitled to manage my courtroom according to my rules, and if Lucent doesn't obey the rules that I give them notice to, then there will be consequences. The consequences were that they did not and could not file an expert report. But it's very important to note that Lucent has said, just as Mr. DeMaris said here this morning, Lucent told Judge Bogle they did not need to file expert reports in response to the motions for summary judgment. That's at page 15213. The court said to Mr. DeMaris, but all right, you're not seeking the right to have experts on summary judgment motions, answered Mr. DeMaris, not for the infringement motions. On the infringement side, we have made our case on the testimony of the Dolby engineers. He stated that he was doing exactly what Aesop did in Centricate versus Aesop, that he was going to rely on engineers who were not experts in tonality to attempt to knit together some evidence, present it to the judge, then have the judge work as his own expert to conclude that maybe that represented tonality. That is not sufficient under Centricate. I would like to, if you have any other questions, I'll move on to another point. Go right ahead. Okay, the second point is that in the prosecution history of the 457 patent, Lucent disclaimed that transient detection constituted a tonality value or a tonality index. The application for the 457 patent was denied over a reference called Schroeder. Schroeder wrote a paper on coding, audio encoding of transients, on the detection of transients. What Schroeder said, and this is at page 9641 of the record, he said that he laid out a procedure for adjusting coding strategy based upon the detection of transients, the presence or absence of transients. And he proposed a change in coding strategy based upon whether or not transients were detected. Lucent told the patent office when their patent was rejected because of Schroeder, they said, quote, and this is at 9388, Schroeder does not teach or suggest generating at least one tonality index. In fact, Schroeder does not even mention the word tonality. So they referred back to the necessary element in the 457 patent. The patent was granted over that. So Schroeder addressed different coding strategies based upon detecting or not detecting a transient. And Lucent told the patent office that did not constitute generating a tonality value or a tonality index. Now, Dolby, now they're saying that Dolby, and this is at page 14 of their reply brief, and I'm quoting from their reply brief, the only question in dispute is whether AC-3's transient-based selection of the exponent strategy generates a value that reflects a tone-like or noise-like quality of the signal. So they told the patent office that changing a coding strategy based upon the detection or not lack of detection of a transient did not constitute generating a tonality value. Now they're before this Court saying that detecting a transient and changing coding strategy does constitute generating a tonality value. I see my light's up. Mr. Cooper, you have not mentioned your cross-appeal, and you haven't reserved any time for rebuttal on the cross-appeal. But I do have one question on that matter, and if you'll direct yourself to your reply brief. The question I have for you, you signed this reply brief. I assume that you wrote this document. Yes. It says on page 2, the bottom paragraph, Lucent admitted the invalidity of the 938 patent over at least four prior art references. Do you stand by that statement? Well, that was a statement that they made when they filed the reissue application. To file the reissue application, they did state in the reissue application that the 938 patent was invalid, and that was part of the reason that they were signing the claim for reissue. None of the citations here are to that reissue. Those citations are to interrogatory responses. The position that Dolby has taken, and I believe it was set forth, maybe that citation there is not complete, but the position that we had taken is that Lucent had, in making their reissue application, stated that the patent was invalid in part, which is the basis for making a reissue application, and that was a substantial part of our reference. That's a different matter than an admission in an interrogatory, and that's what this suggests. In fact, all of these references are to interrogatory responses, and none of those interrogatory responses indicate an admission of any sort. At best, it's a hypothetical situation, which is referenced here. At best. At best, they're talking about a hypothetical situation. Well, I believe also that the fact that they made assertions regarding composite curves, a composite between a masking threshold and the absolute hearing threshold, because now we're addressing the 938 patent, that was fully addressed in the prior art, and that a claim of a patent of a composite threshold, of the composite of the masking and the absolute hearing threshold, would be invalid over prior art. But that may be your view and your position. The question I think that Judge Linder was referring to is you claim in your briefs that Lucent admitted the invalidity of the 938 patent. Well, what I was referring to was the statement in the reissued application. Well, that's not what you cited, and I find this quite disturbing because we have a lot of materials to sort through, and you make a flat-out statement like this, and we dig into the record with all of the citations. There are a number of citations here. There are six different citations, and digging through all of those citations, not a single one of them represents an unqualified admission. Well, I may have overstated that in that use of that word, and I apologize. All right. Let's hear from Mr. DeMaris. Thank you, Your Honor. Just picking up on that last point, and I think I need to point this out, that's not the only thing that's unsupported in Dolby's brief. If you look at page 50, they make the unequivocal proposition that their hearing threshold allows the coding of sounds that are inaudible, and they cite to Fielder's testimony. That is absolutely 100 percent opposite of what Fielder testifies on those pages, and the district court relied on that. The district court found, with respect to the 938 patent, that Dolby's hearing threshold curve was different in purpose from the hearing threshold and that it allowed the coding of inaudible sounds, and Fielder's testimony doesn't support that. Well, we haven't discussed the 938 patent, so I think that's an inappropriate argument in rebuttal. I was bringing it up only because of Your Honor's question to Mr. Cooper about what's in the brief. I think it's incumbent upon the court to actually look at the sites, because as you saw when you asked Mr. Cooper about the questions about what was actually implemented, he didn't actually address the record. He went off and said, well, Brandenburg said it's not. That puts his finger right on the issue in the case, which is we are not allowed at this procedural posture to look at my evidence and see what Brandenburg said and conclude that I'm wrong. I'm entitled to a jury trial. SentraCut is not. . . I'm just. . . just to get to his allegation that you told the patent, not you, but Lucent told the patent and trademark office that transients weren't the same thing as tonality. There's no proof of that in the record. There is no statement ever by Lucent that transients are not the same as tonality. If you look at what we cited to the patent office, it doesn't say that. Do you take the position now that they're the exact same thing? No, no, no. The tonality value that we're arguing in this case is the exponent strategy in AC-3 is the tonality value. That exponent strategy looks at transients, and if there are transients in the signal, one exponent strategy is adopted. If there are no transients, another exponent strategy. So it's the exponent strategy that is the tonality value. But sometimes tonality has transients, right? Tonal signals are non-transient. That's what Dolby tells us in their documents. That's what their engineers said. There are things that the Dolby witnesses refer to about the onset of a tone where you're changing from one particular sound to another tone, and during that transition, that's a noisy proposition. But once it becomes a tone, everybody has testified that that's non-transient, stable. But there's a portion of a tone that has transients, right? No. There is a transition from non-tone to tone, and in that transition region, which the experts called or the witnesses called a transition or a burst or the change from noise to tone in the transition area, or you could call it the onset of a tone, but it's not the tone. The tone is always constant and stable. That's what every witness has testified to. Centricut is totally in opposite to our facts here. In Centricut, they tried to rebut expert testimony with fact witnesses who all said we don't understand the technology, we don't know what we're talking about. That has nothing to do with this case. In this case, we're relying on Dolby's engineers who designed the accused products who are, in fact, the leading audio coding people in the country. The more apt case here is Telemark, where in Telemark, the court relied on inventors and the founder to contradict expert testimony. In Telemark, the expert conclusion was broad and conclusory, and the court said we're not going to listen to a broad and conclusory expert report when we have fact witnesses who testify about what the facts are and they have the knowledge to base that on. Telemark controls this case, not Centricort. I just was going to ask an unrelated matter, which is, and we ask this quite often because a lot of the attorneys that appear before us have these confidentiality markings, which we bump up against when we're trying to write opinions or analyze them. I mean, you've got the appendices are marked confidential and there were certain transcript portions that are marked confidential, I believe. Is that off limits? In my view, there's nothing in there that we care about. I think that was done for Dolby's benefit. I don't believe there's anything in there that Lucent would care to keep confidential. Well, maybe while we're all together, we can get Dolby's comments on that. Any concerns about the confidentiality markings? We will agree that you do not have to avoid reference to any of the matters that were marked. I do. Thank you. Your Honor, I would like to comment to Judge Sarris's question that she asked Mr. Cooper, which is what was the skirmish at the end about the code and whether we had the code. Briefly. Mr. Cooper has totally got wrong the factual background here. It is true that Lucent licensed Dolby's code back in 1996, but we were a licensee. We used the technology. It was under an agreement that that code couldn't be used for anything, and there's no evidence in the record that that code was ever used for anything. We're not allowed to under the agreement. The issue about production in the case, it is true Dolby produced code during discovery. They refused it first, and this is all in the record in the briefs. We had to move to compel to get the code. When that motion to compel was granted, they produced a room full of code, thousands and thousands and thousands of pages of many different versions. They didn't identify what was in the commercial products, what wasn't in the commercial products. We had to bring a second motion to compel to say, tell us which of the room full of code is actually in the commercial products. They refused. The magistrate judge, shockingly, did not deny that aspect of the motion of the code without comment, without analysis, without opinion, did not tell them to tell us which code was in the commercial products. We appealed to the district court. Again, without analysis, the district court said, well, it's not an abuse of discretion. I'm not going to second-guess the magistrate. So today, as I stand here today, Dolby has never answered interrogatory seven, telling us which section of the produced code is in the commercial products. So we don't even have that. We get your point. Thank you, Mr. DeMaris. The case is submitted.